IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

DAVID McCHESNEY,

      Plaintiff,

            Civil Action No.
            9:08-CV-0563 (NAM/DEP)

   vs.

MICHAEL HOGAN, DONALD SAWYER, DR.
TERRI MAXYMILLIAN, JEFFREY NORWICKI,
BILL OWENS, COREY CONNELLY, CHARMINE
BILL, REGINA ANDERSON and THE
TREATMENT TEAM,

      Defendants.

_____

APPEARANCES:       OF COUNSEL:

FOR PLAINTIFF:

DAVID McCHESNEY, *Pro Se*
#25527
CNY Psychiatric Center
PO Box 300
Marcy, NY 13403-0300

FOR DEFENDANTS:

HON. ANDREW M. CUOMO   DEAN J. HIGGINS, ESQ.
Office of Attorney General    Assistant Attorney General
State of New York
The Capitol
Litigation Bureau
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff David McChesney, a convicted sex offender who has been civilly committed to the Central New York Psychiatric Center ("CNYPC") or ("Center") for in-patient sex offender treatment, has commenced this action pursuant to 42 U.S.C. §1983 claiming that he was deprived of his civil rights during the course of his confinement at the Center.  In his complaint plaintiff recites three instances on which he was assaulted by fellow patients on two separate days, asserting that the attacks resulted from defendants' failure to properly protect him from harm in violation of his constitutional rights.  Plaintiff's complaint seeks declaratory and injunctive relief, as well as awards of compensatory and punitive damages.

Currently pending before the court is a motion by the defendants seeking judgment dismissing plaintiff's claims against them, both on the merits and based upon the lack of any showing of their personal involvement in the constitutional violations alleged.  For the reasons set forth below I recommend defendants' motion, which plaintiff has not opposed, be granted.

2

I.    BACKGROUND[1]

Plaintiff, a convicted sex offender, was involuntarily committed to the care and custody of the New York State Office of Mental Health ("OMH"), and designated to the CNYPC on or about December 6, 2007, pursuant to the mandates of the New York Mental Hygiene Law Article 10.[2]  Complaint (Dkt. No. 1) ¶ 3; *see also McChesney v. Hogan*, No. 9:08-CV-1186 (NAM/DEP), Dkt. No. 23 at pp. 4-5.  The Center is an adult psychiatric facility located in Marcy, New York, with a 210 bed maximum security inpatient capacity from which the 150 bed Sexual Offender Treatment Program ("SOTP") is operated.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34-1) ¶¶ 1-2.[3]  During the times relevant to his claims, plaintiff was assigned to unit 304, located within a Motivation On Deck ("MOD") wing.  Bill Decl. (Dkt. No. 34-8) ¶ 6.  Residents are assigned to

---

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    Enacted in 2007, Article 10 of the Mental Hygiene Law provides for civil commitment and treatment of certain individuals convicted of committing sex crimes, recognizing the danger that recidivistic offenders present when released into the community.  *See* N.Y. Mental Hyg. Law § 10.01.

[3]    As will be seen, by failing to respond in opposition to defendants' motion, plaintiff is deemed to have admitted the facts set forth Defendants' Local Rule 7.1(a)(3) Statement. *See* pp. 8 - 9*, post*.

MOD units based upon a history of violence, threats of violence, or other chronic treatment interfering behaviors, and are treated in a setting which permits more intense containment and observation.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34-1) ¶ 19.

On March 19, 2008 plaintiff became involved in an altercation with another patient at the Center.[4]  Complaint (Dkt. No. 1) ¶¶ 15-17; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34-1) ¶¶ 20-27.  The two were separated by staff members, and plaintiff was escorted to a side room.  Complaint (Dkt. No. 1) ¶¶ 17-18.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34-1) ¶ 27.  Prior to the incident, plaintiff had no prior difficulties with the fellow patient.  Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-1) ¶ 28.

Later that day plaintiff returned to the day room, where the earlier altercation had occurred, and while there was struck by another patient. Complaint (Dkt. No. 1) ¶¶ 19-21; Defendants' Local Rule 7.1(a)(3)

---

[4]    There exists some discrepancy in the record as to the date of the first incident.  While plaintiff's complaint alleges that it occurred "[o]n or about March 23, 2008", *see* Complaint (Dkt. No. 1) ¶ 15, it appears more likely from defendants' submissions that it occurred on March 19, 2008.  *See* Bill Decl. (Dkt. No. 34-8) ¶¶ 8-9; *see also* Higgins Decl. (Dkt. No. 34-9), Exh. A at p. 35 of 112.  This potential discrepancy is meaningless for purposes of determining defendants' summary judgment motion.

Statement (Dkt. No. 34-1) ¶¶ 30-39.  The two patients were separated,
and plaintiff was placed in a secure location from 4:00 p.m. until 10:00
p.m. for his own protection.  Complaint (Dkt. No. 1) ¶ 22; Defendants'
Local Rule 7.1(a)(3) Statement (Dkt. No. 34-1) ¶ 40.

A second, seemingly unrelated incident occurred on April 29, 2008
when plaintiff became embroiled in a verbal dispute with a fellow resident
in charge of handing out extra packets of sugar for the evening meal.
Complaint (Dkt. No. 1) ¶ 25; Defendants' Local Rule 7.1(a)(3) Statement
(Dkt. No. 34-1) ¶¶ 42-56.  Although the oral confrontation subsided, the
resident with whom plaintiff had words later came up from behind plaintiff
and struck him in the back of the head, knocking him unconscious and
requiring that he undergo emergency medical treatment at a local hospital.
Complaint (Dkt. No. 1) ¶¶ 26-30.  Defendants' Local Rule 7.1(a)(3)
Statement (Dkt. No. 34-1) ¶¶ 56-57.[5]  As a result of the incident plaintiff
suffers from residual affects of the head injury including head and neck
pain and memory loss.  Complaint (Dkt. No. 1) ¶¶ 31-32, 38-40.

II.   PROCEDURAL HISTORY

---

[5]     The fellow patient who struck McChesney on the head was criminally
prosecuted as a result of the assault, leading to a conviction and a sentence of six
months of incarceration.  Defendants' Local Rule 7.1(a)(3) Statement  (Dkt. No. 34-1)
¶¶ 58-59.

Plaintiff commenced this action on May 28, 2008.  Dkt. No. 1.

Named as defendants in plaintiff's complaint are Michael Hogan, Ph.D.,

Commissioner of the New York OMH; Donald Sawyer Ph.D., the

Executive Director of the CNYPC; Terri Maxmillian, a licensed doctoral

psychologist and the director of the SOTP;[6] Corey Connelly, the Chief of

Security at the Center; Charmine Bill, R.N., a Registered Nurse and a

treatment team leader at the CNYPC; William Owen, the Chief of Security

at the CNYPC; and Regina Anderson, R.N., also a treatment team leader

at the Center.[7]  Complaint (Dkt. No. 1) ¶¶ 5-12; Defendants' Local Rule

7.1(a)(3) Statement ¶¶ 6-14.  Plaintiff's complaint asserts a single cause

of action, complaining of defendants' failure to protect him from harm

while involuntarily detained at the Center.  *See generally* Plaintiff's

Complaint (Dkt. No. 1).

Following joinder of issue and the completion of discovery, which

included the taking of plaintiff's deposition, on October 6, 2009 the

---

[6]     Defendant Maxyimillian has submitted a declaration in support of defendants' motion.  Dkt. No. 34-7.  That declaration, however, is unsigned and therefore has not been considered by the court.  *See* Dkt. No. 34-7.

[7]     Plaintiff's complaint also names "the treatment team", which is neither an individual nor a recognized entity amenable to suit.  *See, e.g.*, *Hoisington v. Co. of Sullivan*, 55 F.Supp.2d 212, 214 (S.D.N.Y. 1999) (Stating that under New York law a department of a municipal entity is merely a subdivision of the municipality, having no separate legal existence and is not amenable to suit) (citations omitted).

defendants moved for summary judgment dismissing plaintiff's claims in their entirety.  Dkt. No. 34.  Despite passage of the October 26, 2009 deadline for responding, plaintiff has failed to file any papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

   A.   Plaintiff's Failure to Oppose Defendants' Motion

      Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

      This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to some

measure of forbearance when defending against summary judgment

motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415

(N.D.N.Y. 1997) (McAvoy, C.J.).  The deference owed to *pro se* litigants,

however, does not extend to relieving them of the ramifications associated

with Local Rule 7.1(b)(3).  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL

278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v.

Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23,

1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-

07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).[8]  Accordingly, absent a

showing of good cause defendants' unopposed summary judgment

motion should be granted, if determined to be facially meritorious. *See

Allen v. Comprehensive Analytical Group, Inc*., 140 F. Supp.2d 229, 231-

32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542,

545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose

defendants' summary judgment motion is not without further

consequences.  By failing to submit papers in opposition to their motion,

---

[8]      Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3)

Statements unchallenged, thus permitting the court to deem facts set forth

in the defendants' statement of material facts not in dispute to have been

admitted based upon his failure to properly respond to that statement.[9]

*See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1

(N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also*

*Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir.

2000) (discussing district courts' discretion to adopt local rules like

7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' motion I

recommend that the court review the motion for facial sufficiency,

accepting defendants' assertions of facts as set forth in their Local Rule

7.1(a)(3) Statement as uncontroverted, and that the motion be granted if

determined to be facially meritorious.[10]

B.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

---

[9]      Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

[10]     Included within defendants' motion papers was a notice to plaintiff advising him of the consequences of failing to respond to their summary judgment motion, in compliance with Northern District of New York Local Rule 56.2.

Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met, the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed.

R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*,

477 U.S. at 250, 106 S.Ct. at 2511.  Though *pro se* plaintiffs are entitled to

special latitude when defending against summary judgment motions, they

must establish more than mere "metaphysical doubt as to the material

facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168

F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider

whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities and draw all inferences from the facts in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.

Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party.  *See Building

Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106

S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.      Merits of Plaintiff's Claim

The essence of plaintiff's claim is that the defendants failed to take appropriate measures to protect him from harm at the hands of the fellow patients who attacked him during the course of the two incidents at issue. In their motion, defendants maintain that no reasonable factfinder could conclude, when applying the requisite standard, that defendants violated plaintiff's constitutional rights during the course of those events.

Plaintiff's claim in this action purports to be brought under both the Eighth Amendment and the due process clause of the Fourteenth.  The Eighth Amendment prohibits cruel and unusual punishment of those convicted of crimes.  *Youngberg v. Romeo*, 457 U.S. 307, 312, 102 S.Ct. 2452, 2456 (1982).  When plaintiff was released by the DOCS into the SOTP program at the Center, he had completed serving his prison term, subject to release on parole, and was no longer a prison inmate; as such, the Eighth Amendment is not applicable under the circumstances.  *Id.* Plaintiff's claims are therefore subject to analysis under the due process clause of the Fourteenth Amendment.  *Dove v. City of New York*, No. 03-

CV-5052, 2007 WL 805786, at * 7 (S.D.N.Y.  March 15, 2007) (citing

cases).

Patients who are involuntarily committed unquestionably are entitled

to certain rights under the Fourteenth Amendment; as the Supreme Court

has noted, "[i]f it is cruel and unusual punishment to hold convicted

criminals in unsafe conditions, it must be unconstitutional to confine the

involuntarily committed . . . in unsafe conditions." *Youngberg*, 457 U.S. at

315-16, 102 S.Ct. at 2458.  "The Supreme Court explained that 'when the

State takes a person into its custody and holds [her] there against [her]

will, the Constitution imposes upon it a corresponding duty to assume

responsibility for [her] safety and general well-being.'" *Beck v. Wilson*,

377 F.3d 884, 889 (8th Cir. 2004) (quoting *DeShaney v. Winnebago*

*Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199-200, 109 S.Ct. 998 (1989)).

 Plaintiff's claim of failure to protect, although framed as arising under the

Eighth Amendment, relates to allegedly unsafe conditions encountered

while he was involuntarily confined at CNYPC, and must be analyzed

within the framework of the Fourteenth Amendment.

The Second Circuit has yet to articulate the proper standard to be

applied when evaluating a failure to protect claim arising out of an

13

involuntary commitment, and there appears to be some uncertainty

regarding the matter.  The Supreme Court "established [in *Youngberg*]

that involuntarily committed mental patients have substantive due process

rights, . . . [and] . . . held that only an official's decision that was a

'substantial departure from accepted professional judgment, practice or

standards' would support a substantive due process claim brought by an

involuntarily committed mental patient."  *Vallen v. Carrol*, No. 02 Civ.

5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y. Sept. 20, 2005) (quoting

*Youngberg*, 457 U.S. at 323).  In *Vallen*, the court examined *Youngberg*

and whether the substantial departure standard evolving from that

decision should be applied where the plaintiff, who was a patient

involuntarily committed to the Mid-Hudson Forensic Psychiatric Facility,

alleged that he was subjected to violence and that the defendants,

security hospital treatment assistants, failed to prevent those incidents.

Distinguishing *Youngberg*, the court stated that

> [u]nlike the defendants in *Youngberg,* the defendants here are
> low-level staff members.  The nature of such an employee
> immediately addressing patient-on-patient assault or theft
> differs significantly from higher-level decisions like patient
> placement and the adequacy of supervision.  For the latter
> decisions, it is readily possible to apply a test based on
> professional judgment, practice or standards.  In this case,
> professionals made none of the challenged decisions, and

thus the "substantial departure" test has no applicability.
*Vallen*, 2005 WL 2296620, at *8.

The court in *Vallen* went on to acknowledge that the general approach to substantive due process claims asserted under section 1983 requires that a plaintiff show that the defendants' actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustified by [any] . . . governmental interest and most likely rise to the conscience-shocking level".  2005 WL 2296620, at *8 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S.Ct. 1708, 1718 (1998)). Ultimately, however, the court suggested that this test would result in an unduly heavy burden being placed upon a plaintiff and also would be inconsistent with the state's central role in supervising and caring for the involuntarily committed.  *Id.* at *9.   Instead, citing *Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees, the court suggested its agreement with the "deliberate indifference" standard employed in such circumstances by the Eighth Circuit.[11]  *Id.* at *9 (citing *Moore v. Briggs*,

---

[11]      While the court stated that it was "inclined to agree with the Eighth Circuit," it did not resolve the issue of the appropriate standard to be applied, finding in that case that "whether the defendants' actions are measured under the 'conscience shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result is the same . . .."  *Vallen*, 2005 WL 2296620, at * 9.

381 F.3d 771, 773 (8th Cir. 2004)).

In *Dove v. City of New York*, a claim similar to that now raised by McChesney was interposed by the plaintiff, another involuntarily committed individual, arising out of altercations with other patients. Rejecting the applicability of the Eighth Amendment to the plaintiff's circumstances, the court likewise acknowledged the lack of certainty as to whether the claim against the defendants should be measured by a "substantial departure" or "deliberate indifference" standard.  *Dove v. City of New York*, No. 03-CV-5052*, 2007 WL 805786, at *8 (E.D.N.Y. Mar. 15, 2007).  Citing *Vallen*, the court failed to reach the issue of which standard would apply, finding that under either no reasonable factfinder could conclude that defendants violated plaintiff's constitutional rights.  *Id.*

I am inclined to agree with the *Vallen* court's conclusion that the "standard of 'deliberate indifference'" best accommodates the constitutional concerns implicated in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights.[12]  *Vallen*, 2005 WL 2296620, at * 9.  Deliberate indifference, for

---

[12]      Though endorsing *Vallen*, I respectfully question the court's reasoning in that case.  At its core the concept of due process is intended to protect against the

16

_____

arbitrary exercise of the powers of government. *Lewis*, 523 U.S. at 845, 118 S.Ct. at 1716.  Determining whether the right to due process has been abridged requires a balancing of an individual's interest in liberty against the state's asserted reasons for restraining individual liberty.  *Youngberg*, 457 U.S. 320, 102 S. Ct. 2460.  To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 at 846, 118 S. Ct. at 1717.  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at. 849, 118 S.Ct. at 1718.  Negligence is "categorically beneath the threshold of constitutional due process." *Id.*  Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S. Ct. at 1718.  As the *Lewis* court explained,

> [d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

*Id.*  Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding.  In *Moore*, the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient.  In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg*, or engage in an analysis of the potentially applicable due process standards.  *See generally, Moore v. Briggs*, 381 F.3d 771.  Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights."  *Moore*, 381 F.3d at 773.  In addition, the court found that under the facts presented "the defendants acted  under circumstances in which actual deliberation was practical . . . [and]. . . [t]herefore their conduct *may* shock the conscience of federal judges only if they acted with 'deliberate indifference.'" *Id.* (emphasis in original) (quoting *Lewis*, 523 U.S. at 851-52, 118 S.Ct. 1708, 1719).

In discussing the concept of deliberate indifference in *Lewis*, the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis*, 523 U.S. at 851, 118 S. Ct. at 1719.  Analogizing to *Youngberg*,  the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of

purposes of the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 1979 (1994); *Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (same).  "In *Lewis,* the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore*, 381 F.3d at 774 (citing *Lewis*, 523 U.S. at 849-40, 118 S.Ct. 1708).

As in *Vallen* and *Dove*, however, I find it unnecessary to resolve the issue of which standard may here be appropriate since under any of the

---

substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation.  The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare."  *Id*. at 852 n. 12, 118 S. Ct. 1719 n.12 (internal citations omitted).

In view of the foregoing, I would interpret *Youngberg* narrowly, not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience- shocking in that environment.

potentially applicable standards plaintiff's claim of failure to protect must

fail.  Plaintiff's complaint describes two occasions on which he was

allegedly assaulted or attacked by other patients while at the CNYPC.

There is no evidence that prior to those incidents plaintiff complained with

regard to either of the other civilly committed individuals involved.  Nor is

there any indication in the record, including the extensive notes of

plaintiff's daily treatment, of circumstances which should have alerted the

defendants and others at the Center to the potential for danger.

Accordingly, regardless of which standard is ultimately applied, there is no

evidence in the record suggesting that any defendant knew of and

disregarded a serious risk of harm to plaintiff, or that any defendant

substantially departed from accepted practices or standards, and no

reasonable factfinder could conclude that defendants' actions deprived

plaintiff of a constitutionally–protected right.  I therefore recommend

dismissal of plaintiff's claims on the merits.

     D.    <u>Personal Involvement</u>

     In their motion, defendants also assert that McChesney's claims

against them are subject to dismissal based upon his failure to alleged

their personal involvement in the claimed failure to protect him from harm.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Many of the defendants named in plaintiff's complaint are nowhere referenced in the body, which contains the factual allegations giving rise to his claims.  Certain of them appear to have been named exclusively based upon their supervisory capacities.  A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can only be established where that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or

20

appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___,129 S.Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

The only named defendants against whom specific allegations of fact are made are defendants Bill, Owens, and Maxymillian.  Plaintiff alleges that following the first incident, defendant Bill arrived on the scene and, after discussing the incident, sent him back into the day room where he was again assaulted, although by a different individual.  Complaint (Dkt. No. 1) ¶ 19.  Plaintiff further alleges that defendant Bill placed plaintiff's antagonist back in the same ward as plaintiff, although there is no allegation that any further incidents involving that person thereafter occurred.  *Id.* ¶ 36.  These allegations fail to suffice with regard to establishing defendant Bill's personal involvement in a failure to protect the plaintiff from harm.

Defendant Terry Maxymillian is also specifically referenced in plaintiff's complaint, but only as having ordered defendant Bill to remove plaintiff from Ward 304 after the individual who had previously attacked him was reassigned there.  *Id.* ¶ 47.  This allegation does not form an integral part of plaintiff's failure to protect claims.

The sole remaining defendant named in the body of plaintiff's complaint is defendant Owens who, it is alleged, was assigned to take photographs of the plaintiff following the first incident.  Complaint (Dkt. No. 1) ¶ 23.  Once again, this does not appear to implicate defendant Owens in any claimed failure to protect McChesney from harm.

It is true that, in a wholly conclusory fashion, plaintiff alleges at one point in his complaint that "[u]pon information and belief, Defendants knew or reasonably should have known, from the Single Detail Progress Notes in both [the second assailant's] and [the third attacker's] clinical records what each of them did to vulnerable people, as if the people were victims of prey." Complaint (Dkt. No. 1) ¶ 43.  This is allegation, however, falls in the category of potentially shocking, but since it is lacks any factual support, it has no meaning.  *Barr v. Abrams,* 810 F.2d 358, 363 (2d cir. 1987).

22

Simply stated, plaintiff's complaint does not contain sufficient factual allegations establishing plausible claims of personal involvement in his failure to protect cause of action on the part of any of the defendants named in his complaint.  I therefore recommend dismissal of plaintiff's claims against each of the defendants on this independent, alternative basis.

## IV.   SUMMARY AND RECOMMENDATION

Plaintiff's complaint asserts that defendants failed to protect him from known harm while confined within the CNYPC to receive sex offender treatment.  The record now before the court, however, contains no evidence from which a reasonable factfinder could conclude that the defendants knew or should have reasonably been aware of the exposure of plaintiff to danger, and that they were deliberately indifferent to that potential threat.  The record also fails to establish a basis to conclude that any of the defendants in this case should be held personably liable for the constitutional deprivations alleged.  Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 34) be GRANTED, and that plaintiff's complaint in this action be dismissed in all respects, with leave to replead.

23

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.


Dated:      August 11, 2010

            Syracuse, NY

David E. Peebles

U.S. Magistrate Judge

24



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Anthony ROBINSON, Plaintiff,
v.
Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.
**No. 96-CV-169 (RSP/DNH).**

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated by the
New York State Department of Corrections ("DOCS"),
sued two DOCS employees, alleging that they violated his
right to due process in the course of a disciplinary
proceeding and subsequent appeal. On September 9, 1997,
defendants moved for summary judgment. Defendants
argued that plaintiff failed to demonstrate that the fifty
days of keeplock confinement that he received as a result
of the hearing deprived him of a liberty interest within the
meaning of the Due Process Clause. Plaintiff did not
oppose the summary judgment motion, and Magistrate
Judge David N. Hurd recommended that I grant it in a
report-recommendation filed April 16, 1998. Plaintiff did
not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. *Sandin v. Conner,* 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
*Id.* Therefore, it is

ORDERED that the report-recommendation is approved;
and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy of this
order on the parties by ordinary mail.
HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local rules
of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth, and
Fourteenth Amendment rights under the United States
Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed R. Civ. P. 56.
However:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d

15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1998.
Robinson v. Delgado
Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton Annex; T.J. Howard, Hearing Officer; J. Maggy, Sergeant; Byron Wind, Officer; Barry Rock, Officer; and Philip Coombe, Jr., Acting Commissioner, Defendants.
No. 95-CV-1733 (RSP/DNH).

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, New York, Darren O'Connor, Esq., Asst. Attorney General, of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 29th of August, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995, he and some other inmates were attacked while incarcerated at Clinton Correctional Facility. Compl., Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this incident he was charged with engaging in violent conduct and conduct which disturbed the order of the facility. *Id.* Although Cotto was found guilty of these charges and sentenced to a term of one year in the Special Housing Unit and loss of six months good time, his sentence was reversed on administrative appeal. *Id.* Cotto brought this action pursuant to 42 U.S.C. § 1983, alleging various violations of his rights under the Eighth and Fourteenth Amendments. *Id.*

By motion filed March 3, 1997, defendants sought summary judgment. Dkt. No. 17. Plaintiff filed no papers in opposition to the motion. In his report-recommendation, the magistrate judge recommended that I grant defendants' motion pursuant to Local Rule 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a motion shall be deemed consent to the relief requested. Dkt. No. 19, at 2. Cotto has filed no objections to the report-recommendation.

After careful review of all of the papers herein, including the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby approved, and it is further

ORDERED that defendants' motion for summary judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *et seq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*, 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See,e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> **FN8.** As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> **FN9.** Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

### CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Horace DOVE, Plaintiff,
v.
CITY OF NEW YORK, Venessa Williams, Staff on
Ward 53 at Kings County Hospital, The Patients on
Ward 53, Jewish Board Family & Children Services,
Owners of Maple Street Residence, Jeffrey Clarke,
Arlene Bishop, Esther, The Staff at Maple Street, Lionel
Young, and Abbot Laboratory of Illinois, Defendants.
**No. 03-CV-5052 JFB LB.**

March 15, 2007.

Plaintiff appears pro se.

John P. Hewson and Lisa Fleming Grumet, Esqs.,
Corporation Counsel of the City of New York, Marc A.
Konowitz, Esq., New York State Attorney General's
Office, New York, NY, for Defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** *Pro se* plaintiff Horace Dove ("Dove") brings this
action against the City of New York (the "City"), Vanessa
Williams ("Williams"), the staff on Ward 53 at Kings
County Hospital, and the patients on Ward 53
(collectively, "defendants"), alleging violations of
plaintiff's constitutional rights pursuant to 42 U.S.C. §
1983 and various state law claims.FN1 Specifically, plaintiff
alleges that, during his time as a patient at Kings County
Hospital (the "Hospital"), (1) the Hospital's policy or
custom of permitting patients to smoke in the Hospital
violated plaintiff's rights, (2) the Hospital's staff and

several patients conspired to assault plaintiff, and (3) the
Hospital's staff failed to protect plaintiff from assaults by
other patients on four separate occasions between June 9,
2002 and July 10, 2002.

> FN1. Defendants Jewish Board of Family &
> Children Services, the owners of the Maple
> Street Residence, Jeffrey Clark, Arlene Bishop,
> Esther, the Staff at Maple Street, Lionel Young,
> and Abbot Laboratory of Illinois are no
> longer parties to this action.

Defendants now move for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure.FN2 For the
reasons that follow, defendants' motion is granted.

> FN2. Plaintiff failed to serve the unidentified
> staff and patients named in the complaint. Thus,
> those defendants have not appeared in the instant
> action.

I. BACKGROUND

A. Facts

Upon consideration of a motion for summary judgment,
the Court construes the facts in the light most favorable to
plaintiff, the non-moving party.FN3 See Capobianco v. City
of New York, 422 F .3d 47, 50 (2d Cir.2005).

> FN3. Defendants submitted a statement, pursuant
> to Local Civil Rule 56. 1, which asserts material
> facts that they claim are undisputed in this case.
> Defendants also complied with Local Civil Rule
> 56.2 by providing notice to plaintiff that he is not
> entitled simply to rely on allegations in his
> complaint, but is required to submit evidence,
> including sworn affidavits, witness statements
> and documents to respond to the motion for
> summary judgment, pursuant to Fed.R.Civ.P.
> 56(e). (See Dkt. Entry # 84.) This action

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

provided actual notice to plaintiff of the consequences of noncompliance with the requirements of Fed.R.Civ.P. 56. *See, e. g., Irby v. N.Y. Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."). Although plaintiff did not respond to defendants' Rule 56.1 Statement in the precise form specified by the local rule, the Court overlooks this technical defect and reads plaintiff's responses liberally as he is *pro se,* and considers factual assertions made by plaintiff in his submissions to the Court as contesting defendants' statement of material undisputed facts, where his statements or evidence conflict. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 63, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted); *see, e.g., Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. April 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Therefore, where the Court cites to defendants' Rule 56.1 Statement, plaintiff has not contested that fact in any of his papers. *See, e.g., Pierre-Antoine v. City of New York,* No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006) (deeming facts in defendants' Rule 56.1 statement as admitted by *pro se* plaintiff, where plaintiff was provided notice of his failure to properly respond to the summary judgment motion under Local Civil Rule 56.2 and the court's review of the record did not reveal that there was a genuine issue of material fact); *Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No. 03 Civ. 7421(KMK), 2005 WL 1026330, at *1 n. 2 (S.D.N.Y. May 3, 2005)

(deeming defendants' factual assertions admitted where *pro se* plaintiff was provided with notice under Local Civil Rule 56.2 and where plaintiff did not submit evidence controverting those factual assertions).

The Hospital is operated by defendant City and offers treatment to patients involuntarily committed for treatment of mental health issues. (Dfts.' 56.1 ¶¶ 7-14.) Defendant Williams is a Coordinating Manager in the Behavioral Health Division of the Hospital. According to the New York City Health and Hospitals Corporation's "Position Description" for a Coordinating Manager, Williams' duties include aiding in the maintenance of a safe and hygienic environment at the Hospital, procuring supplies to facilitate the comfort, safety and therapeutic aspects of the Hospital wards, and supervising the staff that maintains the Hospital's wards. (Dfts.' 56.1 ¶ 27; Hewson Decl., Ex. K.) Moreover, according to the City, Williams' duties do not include the supervision over, or responsibility for, any aspect of patient care. (*Id.*)

On June 9, 2002, New York City police officers brought plaintiff to the Hospital. (Dfts.' 56.1 ¶ 5.) After plaintiff's arrival, a treating physician and a social worker diagnosed plaintiff with schizophrenia of the chronic paranoid type. (*Id.* ¶ 7.) They also found that plaintiff was abusive and threatening to others, was a threat to himself and others, and that he suffered from persecutory delusions. (*Id.* ¶¶ 7, 9, 12.) On June 10, 2002, plaintiff was admitted to the Hospital pursuant to New York Mental Hygiene Law Section 9.39, and sent to Ward 53. (*Id.* ¶ 12; Compl. ¶ 29.) Plaintiff's claims arise out a string of incidents that allegedly occurred while plaintiff was a patient at the Hospital.

### 1. Smoking in the Hospital

According to plaintiff, during his first night at the Hospital, plaintiff's roommates and other patients smoked marijuana and cigarettes in plaintiff's room. (Compl. ¶ 30.) The patients continued to smoke, plaintiff alleges, even though plaintiff told the patients that he had asthma, that he was allergic to marijuana and cigarette smoke, and that the smoke was harmful to him. (*Id.*) Plaintiff also alleges that he complained to the staff about other patients'

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

smoking, but that the staff did nothing to stop the patients from smoking. (*Id.* ¶ 31.) According to plaintiff, the other patients told him that the Hospital staff allowed patients to smoke in their rooms. (*Id.* ¶ 33.)

### 2. The June 15, 2002 Incident

**\*2** On or about June 15, 2002, plaintiff and four other patients at the Hospital were involved in a physical altercation. (Hewson Decl., Ex. E.; Compl. ¶ 35.) According to plaintiff, six patients, including one of his roommates, surrounded plaintiff and "viciously assaulted" him. (Compl. ¶ 35.) Plaintiff alleges that "some of the staff in Ward 53" were warned of the attack in advance and "gave their approval." (*Id.* ¶ 38.) According to plaintiff's deposition testimony, the attackers hit him in the face with an iron rod, kicked him in the face, poured chemicals on his left hand, caused him to bleed from his nose and mouth and rendered him unconscious for two to three hours. (Hewson Decl., Ex. G.)

However, according to the Hospital's records, a physician examined plaintiff following the June 15, 2002 altercation and noted that plaintiff had "no visible injury," and did not indicate that plaintiff had any facial injuries, chemical burns on his hands, blood on his skin or clothes, or had suffered a loss of consciousness. (Hewson Decl., Ex. E.) However, the physician noted that plaintiff's eyeglasses were broken during the altercation. (*Id.*) The Hospital's records also indicate that members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 15, 2002, and there was no evidence that plaintiff had suffered any injuries during that time. (*Id.*, Ex. H.) According to the Hospital's records, the patients involved in the altercation were separated and counseled as to their behavior. (Hewson Decl., Ex. E.)

### 3. The Chair-Throwing Incident

According to plaintiff, on June 22, 2002, another patient threw "iron chairs at [plaintiff's] head." (Compl. ¶ 43.) Plaintiff alleges that, during the incident, the other patient said that plaintiff had complained too much to the staff. (*Id.* ¶ 44.) According to plaintiff, the assault rendered him unconscious for hours. (Hewson Decl., Ex. G.) Moreover,

plaintiff alleges that, following the incident, he ran to the staff office and asked the staff to stop the other patient from assaulting him, but the staff did not tell the other patient to stop. (*Id.* ¶ 43.)

The Hospital's records show that plaintiff was involved in a "chair throwing" incident with another patient on July 2, 2002 rather than, as plaintiff alleges, on June 22, 2002. (Hewson Decl., Ex. F.) According to the Hospital's records, plaintiff was hit in the chest by one of his peers during the incident. (*Id.*) Plaintiff was examined by a physician following the incident on July 2, 2002; the physician found no injuries to plaintiff. (*Id.*, Ex. F.) Moreover, according to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 2, 2002, and there was no evidence that plaintiff had been lying on the floor unconscious or that plaintiff had suffered any injuries during that time. [FN4] (Hewson Decl., Ex. H.) Also, according to the Hospital's records, a psychiatrist evaluated plaintiff on July 2, 2002 and found that he continued to be delusional. (*Id.*)

> FN4. The Hospital's records also indicate that, on June 22, 2002-the alleged date of the chair-throwing incident according to plaintiff-members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day and there was no evidence that such an altercation had occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Ex. H.)

### 4. The June 27, 2002 Incident

**\*3** According to plaintiff, on June 27, 2002, he told Williams that he suffered from asthma and that the smoking by other patients was very harmful to him. (Compl. ¶ 46.) In response, according to plaintiff, Williams told him that patients are permitted to smoke in all of the Hospital's wards and that plaintiff should not complain to the Hospital's staff about other patients smoking in the Hospital. (*Id.* ¶¶ 47, 54.) Moreover, plaintiff alleges that three other patients joined the conversation and that Williams told those three patients that they could "smoke all they want in Ward 53." (*Id.* ¶ 54.)

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

Plaintiff alleges that, following plaintiff's conversation with Williams, plaintiff saw Williams speak separately with the same three patients. (Compl.¶ 51.) Plaintiff concedes in the complaint that he could not hear what Williams and the three patients were saying during this separate conversation. (Compl.¶¶ 51-52.) Moreover, during his deposition, plaintiff confirmed that he had no direct knowledge of the content of the conversation between Williams and the three patients. (Hewson Decl., Ex. G.)

According to plaintiff, on the night of June 27, 2002, five patients, including the three patients with whom Williams had allegedly spoken to, "viciously assaulted" plaintiff in his room. (Compl.¶ 54.) Plaintiff alleges that Williams had conspired with the alleged attackers to harm plaintiff, and that, during the assault, the attackers allegedly told plaintiff that Williams "did not like" plaintiff. (Compl.¶¶ 56, 58.)

According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 27, 2002, and there was no evidence that an incident occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Exs. F, H.)

### 5. The July 9, 2002 Incident

Plaintiff alleges that five patients "viciously assaulted [plaintiff] again" on July 9, 2002. (Compl.¶ 78.) According to plaintiff, the other patients once again assaulted plaintiff with an iron rod and rendered him unconscious. (Hewson Decl., Ex. G.) Plaintiff alleges that, during the alleged assault, he called out to the staff for help but no one came to help him. (Compl.¶ 79.)

The Hospital's records do not reflect that an incident occurred on July 9, 2002. According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 9, 2002, and there was no evidence that an incident had occurred or that plaintiff was injured on that day.

(Hewson Decl., Exs. F, H.) In particular, according to the Hospital's records, plaintiff was examined by hospital personnel sometime after 1:00 p.m. and was found to be "cooperative and friendly," although still suffering from "persecutory delusions." (*Id.,* Ex. F.) Plaintiff was again observed at 10:00 p.m. and "no complaints [were] voiced" by him to the Hospital's staff. (*Id.*)

**\*4** On July 10, 2002, plaintiff was transferred from the Hospital to Kingsboro Psychiatric Center, a New York State facility. (Compl.¶ 84.) Upon arriving at Kingsboro, plaintiff was given a full physical exam by a doctor. (Hewson Decl., Ex. I.) Records of that examination indicate that plaintiff did not have any physical problems except for a rash on his left hand, and that he was in good physical health, had no injury or abnormalities to his head, and denied having any physical ailments. (*Id.*)

### B. Procedural History

Plaintiff commenced the instant action against the City on October 6, 2003. On October 8, 2003, plaintiff filed an amended complaint naming several additional defendants. By Memorandum and Order dated September 28, 2005, the Honorable Nina Gershon dismissed plaintiff's claims against several defendants. On February 10, 2006, the case was reassigned to this Court. On July 17, 2006, defendants moved for summary judgment pursuant to Rule 56.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). Moreover, where the plaintiff is proceeding *pro se,* the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of*

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

*Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)).

The moving party bears the initial burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). However, once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *Tufariello v. Long Island R.R.,* 364 F.Supp.2d 252, 256 (E.D.N.Y.2005).

As such, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Instead, to overcome a motion for summary judgment, the non-moving party must provide this Court "with some basis to believe that his 'version of relevant events is not fanciful.' " *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 37-39 (2d Cir.1986)); *accord Perez v. N.Y. Presbyterian Hosp.,* No. 05 Civ. 5740(LBS), 2006 WL 585691, at *3 n. 1 (S.D.N.Y. March 20, 2006).

### B. Plaintiff's Allegations

**\*5** The standard rule is that, at the summary judgment stage, the court "is ... to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). However, in *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005), the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact is the plaintiff's

"own testimony" which is so lacking in credibility that no reasonable juror could find for the plaintiff. In affirming the dismissal of the plaintiff's suit at the summary judgment stage, the Second Circuit explained:

> [W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony-which was largely unsubstantiated by any other direct evidence-was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id.* at 505 (citing *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 475 (S.D.N.Y.2003) (dismissing excessive force claims brought under 42 U.S.C. § 1983)); *see also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir.1975) (holding that plaintiff had failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiff's earlier deposition); *Schmidt v. Tremmel,* No. 93 Civ. 8588(JSM), 1995 U.S. Dist. LEXIS 97, at *10-* 11 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiff's] complaint or in her subsequent missives to the court"); *Ward v. Coughlin,* No. 93 Civ. 1250(FJS)(RWS), 1995 U.S. Dist. LEXIS 21297, at *11 (S.D.N.Y.1995) (finding plaintiff's self-serving affidavit incredible as a matter of law); *Price v. Worldvision Enters., Inc.,* 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978) (addressing affidavit of party).

Here, the Court believes that there is a clear basis to find that the instant action presents one such "rare circumstance[ ]" where the plaintiff's testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys,* 275 F.Supp.2d at 475 (internal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

quotations and citation omitted). Plaintiff's allegations in his complaint and his deposition testimony provide the sole basis for the alleged disputed issues of fact in this case. However, the credibility of plaintiff's submissions is critically undermined by both the evidence presented by defendants, as well as the gross inconsistencies found in plaintiff's own submissions. See *Law Offices of Curtis V. Trinko, LLP v. Verizon Comm'ns. Inc.,* No. 00 Civ.1910(SHS), 2006 WL 2792690, at *9 (S.D.N.Y. Sep. 27, 2006).

**\*6** First, as set forth in the facts section, the Hospital's records contradict plaintiff's testimony as to the occurrence of several of the alleged assaults and as to the occurrence or the severity of all of plaintiff's alleged injuries.[FN5] Second, as discussed more fully below, plaintiff has undermined his own allegations regarding Williams' involvement in the alleged June 27, 2002 assault by conceding that he has no personal knowledge, or any other evidence, that Williams conspired to assault him.

> [FN5.] There is no credible evidence demonstrating that any of the incidents alleged by plaintiff even occurred, save for the June 15, 2002 incident and the chair-throwing incident. As discussed *supra,* the Hospital's records confirm that plaintiff was involved in a physical altercation with four other patients on June 15, 2002, as well as some type of "chair-throwing" incident with another patient on July 2, 2002. However, as to the June 15, 2002 incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the altercation, much less the severe injuries alleged by plaintiff, which include facial cuts, bleeding, chemical burns, and brain damage. Moreover, plaintiff's own submissions drastically diverge as to the severity of the injuries he allegedly suffered during the June 15, 2002 altercation. Similarly, as to the chair-throwing incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the incident, much less the severe injuries alleged by plaintiff. Moreover, plaintiff's own allegations regarding the chair-throwing incident are grossly inconsistent.

Finally, plaintiff's own submissions are replete with contradictory descriptions of the injuries he allegedly suffered as a result of the alleged assaults. As to the alleged June 15, 2002 assault, plaintiff variously asserts that he suffered just "headaches" (Compl.¶ 39), or "severe brain damage" (Dep. Tr., at 88), as a result of the assault. As to the chair-throwing incident, plaintiff contends both that he was assaulted by five patients (Dep. Tr. at 91), and that he was assaulted by just one patient (Compl.¶ 43). Also as to the chair-throwing incident, plaintiff fails to allege in the complaint that he suffered any injuries during the incident. However, plaintiff asserts in his deposition testimony that he was rendered unconscious as a result of the incident and remained so for "hours." (Pl.'s Dep. at 91-92.) As to the alleged July 9, 2002 assault, plaintiff asserts in his complaint that he "became unconscious" as a result of the assault, and fails to allege what, if any, weapons were used during the assault. However, in his deposition testimony, plaintiff contends that the assailants used an "iron rod" and left a "scar" on his forehead. (Pl.'s Dep. at 108.)

Therefore, the Court finds that, given the complete lack of evidence to support plaintiff's claims regarding these assaults and the alleged severe injuries resulting therefrom, the Hospital documentation fully contradicting such claims, and the drastic inconsistencies in plaintiff's own statements regarding these incidents, dismissal is warranted under *Jeffreys* because no reasonable juror could credit plaintiff's unsubstantiated testimony under these circumstances. However, even if the Court fully credited plaintiff's allegations regarding these incidents, summary judgment is still appropriate because he has produced no competent evidence demonstrating that these defendants are liable for the alleged actions of the other patients. As set forth more fully below, even assuming *arguendo* that the smoking by other patients and all of the assaults referred to in plaintiff's testimony actually occurred, plaintiff has failed to establish a genuine issue as to defendants' liability for the alleged deprivations of plaintiff's rights.

C. Claims Against the Unnamed Defendants

At this stage of the case, discovery has been completed and plaintiff has failed to identify or to serve with process any of the unnamed defendants allegedly responsible for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

the deprivation of plaintiff's rights. Moreover, plaintiff does not assert that additional discovery will help to ascertain the identities of such individuals. Accordingly, because a "tort victim who cannot identify the tortfeasor cannot bring suit," the Court grants summary judgment as to plaintiff's claims against the unnamed defendants. *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1996); *see, e.g., Peterson v. Tomaselli, --- F.Supp.2d ----, 2007 WL 102073, at *18 (S.D.N.Y.2007); Alicea v. City of New York,* No. 04 Civ. 1243(RMB), 2005 WL 3071274, at *1 n. 1 (S.D.N.Y. Nov. 15, 2005).

### D. Due Process Claims

**\*7** Plaintiff asserts, *inter alia,* a violation of his rights under the Eighth and Fourteenth Amendments. However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir .1996); *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at *9 (S.D.N.Y. Sept. 20, 2005); *see also Fair v. Weiburg,* No. 02 Civ. 9218(KMK), 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006).

"An involuntary civil commitment is a massive curtailment of liberty, ... and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (citation and quotation omitted); *see Graves v. MidHudson,* No. 04 Civ. 3957(FB), 2006 WL 3103293, at *3 (E.D.N.Y. Nov. 2, 2006). However, in this case, the complaint, even as liberally construed, fails to allege that plaintiff's rights were violated during the civil commitment process.[FN6]

> **FN6.** The Court notes that plaintiff's brief in response to the instant motion consists principally of quotations from Supreme Court opinions regarding the process due to individuals prior to their involuntary commitment to a mental hospital. However, the entirety of plaintiff's remaining submissions to the Court-that is, other than his response brief-fail to

allege or to address a claim that plaintiff's pre-commitment procedural rights were violated by defendants; nor has plaintiff requested leave to amend his complaint to allege such a claim. Moreover, at his deposition, plaintiff was asked to clarify whether he was, in fact, alleging a violation of his pre-commitment procedural rights. Plaintiff declined to do so. (Hewson Decl., Ex. G.) Accordingly, the Court declines to address any such claim at this time.

However, " '[t]he mere fact that an individual has been committed under proper procedures ... does not deprive him of all substantive liberty interests under the Fourteenth Amendment.' " *MidHudson,* 2006 WL 3103292, at *3 (citing *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982)). Such individuals retain a right to " 'conditions of reasonable care and safety' " during their confinement. *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (quoting *Youngberg,* 457 U.S. at 324); *Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *8 (S.D.N.Y. Aug. 20, 2001) (citing *Youngberg,* 457 U.S. at 315-16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.")); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."); *Beck v. Wilson,* 377 F.3d 884, 889-90 (8th Cir.2004) ("Because [plaintiff] was an involuntarily committed patient ... the Fourteenth Amendment imposed upon the defendants, as state actors, an affirmative duty to undertake some responsibility for providing [her] with a reasonably safe environment.").

In *Youngberg,* the Supreme Court set forth the standard for adjudicating Section 1983 claims brought by involuntarily committed mental patients against "professional" officials charged with the patients' care. *Youngberg,* 457 U.S. at 322-24; *see Vallen,* 2005 WL 2296620, at *9; *Warheit v. City of New York,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at *11 (S.D.N.Y. Aug. 15, 2006); *Lombardo,* 2001 WL 940559; *Marczeski v. Handy,* No. 01 Civ. 01437(AHN)(HBF), 2004 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

2476440, at *8 (D.Conn. Sept. 9, 2004) (Fitzsimmons, Magistrate J.). In reviewing such claims, the critical question is whether the charged official's decision was alleged to have caused a deprivation was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323; *see Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir.1996) ("This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference.").

**8** Notably, however, the Court in *Youngberg* specifically limited the substantial departure standard to claims against "professionals," or "person[s] competent, whether by education, training or experience, to make the particular decision at issue," and contrasted such persons with non-professionals, or "employees without formal training but who are subject to the supervision of qualified persons." *Youngberg*, 457 U.S. at 323 n. 30; *see Kulak*, 88 F.3d at 75. As such, some courts have declined to apply the *Youngberg* standard to officials deemed to be "low-level staff members," and, instead, apply a "deliberate indifference" standard to Section 1983 claims against such officials, asking whether "the [challenged] officials displayed a mental state of deliberate indifference with respect to [plaintiff's] rights." *Marczeski*, 2004 WL 2476440, at *8; *see Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1147 (3rd Cir.1990) ("Nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg*, only to a deliberate indifference standard."); *Moore v. Briggs*, 381 F.3d 771, 773 (8th Cir.2004) (applying deliberate indifference standard to Section 1983 claims against staff at a group home for the mentally retarded); *see also Vallen*, 2005 WL 2296620, at *9 ("I am inclined to agree ... that the standard of 'deliberate indifference' is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights.").

However, in this case, the Court need not reach the issue of whether defendants' actions should be evaluated under the "substantial departure" or "deliberate indifference" standard because, under either standard, the result is the same: no reasonable factfinder could conclude based upon the evidence, drawing all inferences in plaintiff's favor,

that defendants' conduct substantially departed from accepted professional judgment, practices, or standards, or was deliberately indifferent to plaintiff's constitutional rights. *See Vallen*, 2005 WL 2296620, at *9.

As the Second Circuit has observed:

Rule 56(e) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.

*U.S. v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir.1982) (quotations and citations omitted); *see Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (requiring that the party opposing summary judgment "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful"). Here, the Court finds that plaintiff has failed to set forth any evidence, beyond mere "surmise or conjecture," in support of his allegations that defendants were personally involved in the alleged deprivations of plaintiff's constitutional rights or that a municipal policy or custom caused the alleged deprivations.

(i) Due Process Claims Against Williams

**9** In order to be held liable under § 1983, each defendant must have been personally involved in the alleged constitutional violation. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal citation omitted); *see also Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.1987). "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). As such, the Second Circuit has held that the personal involvement of supervisory officials may be established by evidence that: (1) the defendant participated directly in the alleged constitutional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited gross negligence or deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

In this case, plaintiff alleges that Williams was involved in the deprivation of his right to reasonable care and safety in two ways. First, plaintiff alleges that, on June 27, 2002, Williams told other patients that they could smoke in the Hospital. (Compl.¶ 54 .) Second, plaintiff alleges that Williams had foreknowledge of the alleged assault against Williams that occurred on June 27, 2002, and "conspired" with the alleged attackers to harm plaintiff. (Compl. ¶¶ 53, 56.) For the reasons set forth below, the Court finds that plaintiff fails to present facts from which a reasonable factfinder could conclude that Williams was personally involved in the deprivation of any rights guaranteed to plaintiff by the Fourteenth Amendment.

First, plaintiff alleges that Williams violated plaintiff's rights by telling other patients that they could smoke in the hospital, thus causing harm to plaintiff. In particular, plaintiff asserts that he informed Williams about the serious health risks posed to plaintiff by other patients' smoking habits and that he witnessed Williams tell other patients that they could smoke in the Hospital.

However, assuming *arguendo* that the alleged conduct, if true, would constitute a violation of plaintiff's right to reasonable care and safety, plaintiff has failed to produce any affirmative evidence in support of his allegations that Williams was personally involved in causing other patients to smoke. Specifically, in support of his allegations, plaintiff points to a single conversation with Williams on June 27, 2002, wherein Williams allegedly told plaintiff and three other patients that patients were permitted to smoke in the Hospital. (Compl.¶¶ 46-49, 51-53.) However, plaintiff has failed to present any facts demonstrating that this conversation actually caused any patients to smoke in the Hospital or even that, following

the alleged conversation, other patients actually did smoke in the Hospital. Plaintiff points to specific instances of patients smoking in his room at times *preceding* the alleged conversation with Williams, but he fails to allege or to offer any evidence from which this Court could reasonably infer that Williams *caused* patients to smoke in the Hospital.

**\*10** Thus, the Court finds that plaintiff has failed to present any evidence, beyond conjecture, from which the Court could reasonably infer that Williams' conduct caused plaintiff to suffer "actual or imminent harm." *See Benjamin,* 343 F.3d at 51 n. 17 ("To establish the deprivation of a basic human need such as reasonable safety, an inmate must show 'actual or imminent harm.' ") (quoting *Lewis v. Casey,* 518 U.S. 343, 350 (1996)). Accordingly, plaintiff's claims against Williams arising from alleged smoking in the Hospital are dismissed.

Second, plaintiff has failed to set forth concrete evidence showing that Williams was personally involved in the alleged June 27, 2002 assault of plaintiff by other patients. Plaintiff offers nothing more than bald assertions that Williams condoned the assault and conspired with the alleged attackers to harm plaintiff. In support of these allegations, plaintiff points to a second conversation involving Williams and three other patients that allegedly also took place on June 27, 2002, wherein Williams and the patients allegedly "conspired and or agreed" that the patients would assault plaintiff that night. (*See* Compl. ¶ 62.)

However, even assuming *arguendo* that plaintiff observed a conversation between Williams and three other patients on June 27, 2002 and that plaintiff was actually assaulted that night, plaintiff has failed to raise a triable issue as to whether Williams conspired or agreed to assault plaintiff. In the complaint, plaintiff concedes that he has no direct knowledge of the contents of the alleged conversation; he claims that Williams pulled the three patients "aside so that she could talk to them without me hearing what they were talking about." (Compl.¶ 52.) Moreover, at his deposition, plaintiff confirmed that he had no direct knowledge of the conversation or of Williams' approval of the alleged assault. (Hewson Decl., Ex. G.) Although plaintiff also asserted at his deposition that he knew of other patients that had overheard staff members approve

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

the alleged assault, plaintiff has failed to identify those witnesses. (*Id.*)

Accordingly, because plaintiff has failed to produce *any* affirmative evidence, beyond conjecture, demonstrating that Williams participated in, directed, or had knowledge of the alleged June 27, 2002 assault, the Court grants defendants' motion as to plaintiff's claims against Williams arising from that assault.

(ii) Due Process Claims against the City

It is well-settled that municipalities may not be liable under § 1983 for constitutional torts committed by its employees under a *respondeat superior* theory; rather, to prevail against a municipality, a plaintiff must demonstrate that his injury "was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.' " *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 108-9 (2d Cir.2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986)); *accord Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005). "In essence, 'municipalities such as the City of New York may only be held liable when the city itself deprives an individual of a constitutional right.' " *Warheit,* 2006 WL 2381871, at *12 (quoting *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)).

*11 Moreover, courts must apply "rigorous standards of culpability and causation" to *Monell* claims in order to ensure that "the municipality is not held liable solely for the actions of its employee." *Bd. of Cty Com'rs of Bryan Cty, Okl. v. Brown,* 520 U .S. 397, 405 (1997). "Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the state." *Davis,* 228 F.Supp.2d at 336 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 831 (1985) (Brennan, J., concurring in part and concurring in the judgment)). Instead, to constitute a "policy," the municipality must have either enacted an official policy measure or an employee with "policy making authority" must have undertaken an unconstitutional act. *See Pembaur,* 475 U.S. at 480-81. A "custom," although it need not receive formal approval by the municipality, must be "so persistent or widespread as to constitute a custom or usage with the force of law" and "must be so

manifest as to imply the constructive acquiescence of senior policy-making officials." *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quotation marks and citations omitted). "To succeed on this theory, plaintiff must prove the existence of a practice that is permanent." *Davis,* 228 F.Supp.2d at 337. For the reasons that follow, the Court finds that no reasonable factfinder could conclude that the alleged deprivation of plaintiff's rights was caused by a municipal policy or custom.

1. Smoking in the Hospital

Plaintiff alleges that it was the "policy or custom" of the City to permit patients to smoke in the Hospital, thus depriving plaintiff of his right to reasonable care and safety during his confinement. However, defendants have demonstrated that the City's official policy is to prohibit smoking in health care facilities, except in designated areas. *See* N.Y.C. Admin. Code § 17-503 ("Smoking is prohibited in ... [h]ealth care facilities including ... hospitals ... [and] psychiatric facilities ..., provided however, that this paragraph shall not prohibit smoking by patients in separate enclosed rooms of residential health care facilities or facilities where day treatment programs are provided, which are designated as smoking rooms for patients."). Plaintiff has failed to present any facts that create a triable issue as to whether City policymakers altered this policy at the Hospital or that it was the custom or practice of the City to deviate from this policy.[FN7] In addition, plaintiff has failed to identify any members of the Hospital's staff that allegedly permitted other patients to smoke or the other patients that allegedly told plaintiff they had received permission to smoke from members of the Hospital's staff.

FN7. Even assuming *arguendo* that Williams told patients and staff members on June 27, 2002 that patients were permitted to smoke in the hospital, a "single instance" of improper conduct by Williams, who lacks final policymaking authority to suspend the smoking prohibition set forth in New York City Administrative Code § 17-503, would not create a triable issue of fact as to the existence of an unconstitutional policy or a custom or practice so widespread as to have the force of law. *See Sewell v. N.Y.C. Transit Auth.,* 809 F.Supp. 208, 217 (E.D.N.Y.1992) ("[W]hen

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

an official's discretionary decisions are constrained by policies not of that official's making, those [municipal] policies, rather than the subordinate's departures from them, are the act of the municipality.") (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)).

Accordingly, because plaintiff "points to no evidence, other than his own speculation, that such a custom or policy exists," *Warheit,* 2006 WL 2381871, at *13, the Court finds that plaintiff has failed to raise a genuine issue as to whether the City is liable under Section 1983 for permitting patients to smoke in the Hospital. *See Opals on Ice Lingerie v. Body Lines Inc.,* 320 F.3d 362, 370 n. 3 (2d Cir.2003) ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.' ") (quoting *Contemporary Mission v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

### 2. Assaults on Plaintiff

**\*12** Plaintiff alleges that Hospital staff had foreknowledge of each of the alleged assaults against plaintiff by other patients and that it was the "policy and custom" of the City to allow such assaults to occur. (Compl.¶ 67.) As to the alleged "policy" that harmed plaintiff, plaintiff fails to identify any municipal official with policy making authority who was involved in an assault against plaintiff or to provide any documents, affidavits, or other evidence from which a reasonable jury could find that such a policy actually exists. *See Warheit,* 2006 WL 2381871, at *12 n. 4 (finding no unconstitutional policy where plaintiff "provides no evidence, other than his own bare allegations, that such a policy exists").

As to the alleged "custom" of Hospital staff to permit other patients to assault plaintiff, the Court finds that no reasonable factfinder could conclude that the alleged assaults were caused by an unofficial practice of the Hospital "so persistent or widespread as to constitute a custom or usage with the force of law." *Green,* 465 F.3d at 80.

Plaintiff has failed to specifically identify any defendants, other than Williams, who failed to protect plaintiff from attacks by other patients. Moreover, even as to the unnamed staff members who allegedly permitted assaults on plaintiff, plaintiff has failed to present evidence showing that a trial is needed on the issue of whether a practice existed among Hospital staff to allow assaults against plaintiff. Specifically, plaintiff has failed to present any facts, beyond mere conjecture, demonstrating that the Hospital staff had foreknowledge of the alleged assaults or that they failed to act or to intervene to protect plaintiff from such assaults. *See Vallen,* 2005 WL 2296620, at *11 (granting summary judgment were there was "nothing in the record that shows whether [hospital staff] observed the attack and failed to act or intervene").

First, as to the June 15, 2002 incident, plaintiff fails to offer any facts demonstrating that members of the Hospital's staff knew of or condoned the alleged assault, other than his unsupported speculation that "some of the staff" knew of the assault and gave their approval. (*See* Compl. ¶¶ 35, 38.)

Second, as to the alleged chair-throwing incident, plaintiff fails to present any facts from which a reasonable factfinder could infer that Hospital staff knew of or failed to stop the alleged assault. Plaintiff merely alleges that, *following* the assault, he "told the staff to tell [the other patient] to stop but they did not tell him to stop it." (Compl.¶ 43.)

Third, as to the June 27, 2002 incident, the Court found *supra* that plaintiff has failed to present any facts that create a triable issue as to the alleged deprivation of plaintiff's rights based on the conduct of Williams. Plaintiff does not allege that any other defendants were involved in that alleged assault.

Finally, as to the alleged assault that occurred on July 9, 2002, plaintiff asserts that he called out to Hospital staff for help but no staff members came to help him. However, there is nothing in the record from which a reasonable juror could find that members of the Hospital's staff observed the alleged assault, or heard plaintiff's call for help and failed to act or to intervene in the assault.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

**\*13** Accordingly, because plaintiff has failed to identify a municipal policy or custom that caused injury to plaintiff, the Court finds that no reasonable factfinder could conclude that the City was liable for the alleged deprivation of plaintiff's rights.

### E. Other Federal Claims

Plaintiff also alleges various other claims arising from the alleged deprivation of his federal rights. For the reasons that follow, the Court grants summary judgment as to all of defendants' remaining federal claims.

First, because the Court found *supra* that plaintiff has failed to offer any evidence of an agreement between Williams and plaintiff's alleged attackers and because plaintiff has failed to specifically identify any other government officials that entered into such an agreement, plaintiff's Section 1983 and Section 1985 conspiracy claims are dismissed. *See, e.g., Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir.1999); Thomas v. Roach, 165 F.3d 137, 147 (2d Cir.1999).* Moreover, because no actionable conspiracy exists, plaintiffs' Section 1986 claims must also fail. *See Dwares v. New York,* 985 F.2d 94, 101 (2d Cir.1993) ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.") (citing *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.1978)).

Second, plaintiff's Section 1981 claim is dismissed because plaintiff has failed to allege, or provide any proof, that any individuals intended to discriminate against plaintiff on the basis of race. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999).

Finally, plaintiff's Section 1988 claim for attorney's fees is dismissed because plaintiff is not the "prevailing party" in this case. 42 U.S.C. § 1988; *see Ass'n for Retarded Citizens of Conn., Inc. v. Thorne,* 68 F.3d 547, 551 (2d Cir.1995).

### F. State Law Claims

Plaintiff also asserts claims under the New York State Constitution. (Compl.¶ 1.) Defendants argue that plaintiff's pendent state law claims must be dismissed for failure to file a Notice of Claim pursuant to New York General Municipal Law Sections 50-e and 50-i. *See Hardy v. N.Y.C. Health & Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir.1999) (holding that in federal court, state notice-of-claim statutes apply to state law claims). Plaintiff does not dispute defendants' assertion that a Notice of Claim was not filed for any of his state law claims.

Sections 50-e and 50-i require a party asserting a state law tort claim against a municipal entity or its employees acting in the scope of their employment to file a notice of claim within ninety days of the incident giving rise to the claim and requires the plaintiff to commence the action within a year and ninety days from the date on which the cause of action accrues. *See N.Y. Gen. Mun. Law §§ 50-e, 50-I.* "Under New York law, notice of claim is a statutory precondition to filing suit against the City or its employees." *Harris v. Bowden,* No. 03 Civ. 1617(LAP), 2006 U.S. Dist. LEXIS 12450, at \*22 (S.D.N.Y. March 23, 2006). "A plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its employees in a federal civil rights action." *Robinson v. Matos,* No. 97 Civ. 7144(TPG), 1999 U.S. Dist. LEXIS 5447, at \*3 (S.D.N.Y. April 19, 1999) (citing *Felder v. Casey,* 487 U.S. 131, 151 (1988)).

**\*14** Furthermore, the Court does not have jurisdiction to allow plaintiff to file a late notice of claim. *Corcoran v. N.Y. Power Auth.,* No. 95 Civ. 5357(DLC), 1997 U.S. Dist. LEXIS 14819, at \*19 (S.D.N.Y. Sept. 26, 1997); *see also* N.Y. Gen. Mun. Law § 50(e)(7) ("All applications under this section shall be made to the supreme court or to the county court."). Accordingly, defendants' motion to dismiss plaintiff's state law claims is granted.[FN8] *See Gonzalez v. City of New York,* No. 94 Civ. 7377(SHS), 1996 U .S. Dist. LEXIS 5942, at \*5-\*6 (S.D.N.Y. May 3, 1996) ("Despite the statute's seemingly plain language, it applies not only to suits against municipal corporations but also to suits against 'officer[s], agent[s] or employee[s]' whose conduct has caused injury.").

FN8. Plaintiff also seeks relief under "[a]pplicable ... State Statutes," but fails to identify, and the Court is unable to discern,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

which, if any, state statutes apply to this case. (*See* Compl. ¶ 1.) Nevertheless, even assuming *arguendo* that plaintiff had properly alleged state statutory claims, such claims must also be dismissed due to plaintiff's failure to file a Notice of Claim. *See, e.g., Flynn v. New York City Bd. of Educ.,* No. 00 Civ. 3775(LAP), 2002 WL 31175229, at *9-*10 (S.D.N.Y. Sept. 30, 2002) (dismissing New York state statutory claims due to plaintiff's failure to file a notice of claim).

Moreover, even assuming *arguendo* that plaintiff had filed a notice of claim, the Court would, in its discretion, "decline to exercise supplemental jurisdiction over [plaintiff's] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. New York Presbyterian Hospital,* 455 F.3d 118, 121-22 (2d Cir.2006) (quoting 28 U.S.C. § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial ... the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 U.S. Dist. LEXIS 12842, *11 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

### III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED and plaintiff's claims are dismissed in their entirety. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

E.D.N.Y.,2007.
Dove v. City of New York
Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Barry Lee VALLEN Plaintiff,
v.
S.H.T.A. CARROL; S.H.T.A. Gantz; S.H.T.A.
Gonzales; S.H.T.A. Malfatone; S.H.T.A. Nelson;
S.H.T.A. Leper; Dr. Beneb Ting; Senior S .H.T.A. John
Doe; S.H.T.A. March; S.H.T.A. Adams; S.H.T.A.
Brown; S.H .T.A. Jones; and Various S.H.T.A. John
Does, Defendants.
No. 02 Civ. 5666(PKC).

Sept. 20, 2005.

*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Barry Lee Vallen brings this action, pursuant
to 42 U.S .C. § 1983, alleging that he was the victim of
multiple patient-to-patient assaults and deprivations of
property during the time that he resided at the
Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"),
a facility operated by an agency of the state of New York.
In a Memorandum and Order dated September 2, 2004, I
dismissed defendants New York State Office of Mental
Health and Mid-Hudson on the basis of the state's
constitutionally-based immunity from suit. *Vallen v.
Mid-Hudson Forensic Office of Mental Health,* 2004 WL
1948756 (S.D.N.Y. Sept. 2, 2004). I concluded that the
Complaint set forth allegations sufficient to state claims
against the individual defendants for deliberate
indifference to confinement conditions that were seriously
and dangerously unsafe. *Id.* at *3. I held that plaintiff's
claim did not arise under the Eighth Amendment because
he was not serving a term of imprisonment pursuant to a
conviction, but, generously construed, his *pro se*
Complaint could be read as alleging that persons acting

under color of state law had deprived him, as an
involuntarily detained person, of rights protected by the
Fourteenth Amendment. *Id.*

Discovery in this action is now closed. The defendants
have moved for summary judgment dismissing the
plaintiff's claims. For the reasons explained below, the
defendants' motion is granted.

*Background*

The following facts are taken from plaintiff's pleadings,
his sworn deposition testimony or are otherwise not
disputed. Where multiple inferences can be drawn from
the facts, I have considered only the one most favorable to
Mr. Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of
second-degree murder in connection with the death of his
parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty
by reason of mental illness or defect and was diagnosed as
a paranoid-schizophrenic. (Vallen Dep. at 169-71) A
Justice of the New York Supreme Court, Orange County,
found that, at that point in time, the plaintiff suffered from
a dangerous mental illness and ordered that he be
committed to a psychiatric facility. (Vallen Dep. at 170)
Subsequently, plaintiff was discharged to outpatient care
on two occasions, but in each instance he was later
recommitted. (Vallen Dep. at 172-84) From April 18,
1997 through June 14, 2000, plaintiff was an inpatient at
Mid-Hudson. (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael B.
Mukasey dismissed plaintiff's deprivation of property
claim and ruled that the State of New York provided
adequate post-deprivation remedies for the recovery of
lost property. (July 22, 2002 Order at 3) He also ruled that
the Complaint inadequately detailed the assault claims,
and dismissed those claims without prejudice. (July 22,
2002 Order at 2, 4-5) Plaintiff filed an Amended
Complaint ("AC") dated January 24, 2003.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

The AC alleges that, during his three years of treatment at Mid-Hudson Forensic Psychiatric Facility, the plaintiff was subjected to violence and threats of violence, and that the individual defendants promoted or failed to prevent these incidents. The individual defendants were employed as security hospital treatment assistants ("SHTAs") who were responsible for assisting psychiatric patients in their day-to-day needs and activities. (DeLusso Aff. ¶¶ 2-3)

**\*2** Each of the incidents set forth in the AC are discussed below. Generally described, the plaintiff alleges that the defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid-Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome

of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)*. The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004)*.

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir.2004)* (quoting *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993)*).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. *Forsyth v. Fed'n Empl. & Guidance Serv., 409 F.3d 565, 569 (2d Cir.2005)*. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995)* (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)*. In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

**\*3** The defendants have served the *pro se* plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56.2. I am mindful of the latitude afforded to a *pro se* party opposing

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

a summary judgment motion. See *Forsyth,* 409 F.3d at 570 ("special solicitude" owed to *pro se* litigants opposing summary judgment); *Shabtai v. U.S. Dep't of Educ.,* 2003 WL 21983025, at *5 (S.D.N.Y. Aug. 20, 2003) (obligation to construe leniently *pro se* opposition papers on a summary judgment motion). However, a party's *pro se* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, at *9 (S.D.N.Y. Aug. 25, 2004).

*Discussion*

1. *Statute of Limitations Defense*

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. *Owens v. Okure,* 488 U.S. 235, 249-50 (1989). "Accordingly ... New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). The statute of limitations begins to accrue " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)).

This action was filed in the *pro se* office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the delivery to the *pro se* office on December 10, 2001. See *Ortiz v. Cornetta,* 867 F.2d 146 (2d Cir.1999); *Toliver v. Sullivan County,* 841 F.2d 41 (2d Cir.1988). It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, *i.e.* prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears

the burden of proof on tolling. See *Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794 (3d Dep't 2005); *Assad v. City of New York,* 238 A.D.2d 456, 457 (2d Dep't 1997).

CPLR 208 provides for tolling when "a person entitled to commence an action [was] under a disability because of infancy or insanity at the time the cause of action accrues...." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. *McCarthy v. Volkswagen of Am.,* 55 N.Y.2d 543 (1982). The *McCarthy* Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted." *Id.* at 548. In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* at 548-549. New York courts have consistently applied the *McCarthy* standard to claims of tolling by reason of insanity. *See, e.g., Eberhard v. Elmira City School Dist.,* 6 A.D.3d 971, 973 (3d Dep't 2004) (*McCarthy* standard not satisfied by claim of post-traumatic stress syndrome); *Burgos v. City of New York,* 294 A.D.2d 177, 178 (1st Dep't 2002) ("The doctor's affirmation ... was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the *McCarthy* standard).

**\*4** The standard articulated in *McCarthy* has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society." I assume for the purposes of this motion that, during the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has had several "retention hearings" that have resulted in findings that Vallen should remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights in judicial proceedings instituted during the period for which he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff., Ex. C) He was then familiar with the necessity of timely filing a claim, as evidenced by his handwritten complaint dated November 16, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as required by law." (Peeples Aff., Ex. C) [FN1] *Vallen v. State of New York*, Claim No. 100141 (N.Y.Ct.Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent by permitting a patient identified as C.J. to initiate a physical attack. [FN2] (Peeples Aff. Ex. D) *Vallen v. State of New York,* Claim No. 100803 (N.Y.Ct.Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property; in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) *Vallen v. State of New York,* Claim No. 100804 (N.Y.Ct.Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) *Vallen v. Connelly,* 99 Civ. 9947(SAS). [FN3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) *Vallen v. State of New York,* Claim No. 102160 (N.Y.Ct.Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding *pro se,* filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. *Cf. Cerami v. City of Rochester Sch. Dist.,* 82 N.Y.2d 809, 813 (1993) (considering, inter alia, the numerous lawsuits filed by the party claiming toll in rejecting such a claim).

FN1. The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff., Ex. F)

FN2. To protect their privacy, all Mid-Hudson patients other than the plaintiff will be identified via their initials.

FN3. *See also Vallen v. Connelly,* 36 Fed. Appx. 29 (2d Cir. June 11, 2002), *on remand,* 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

*5 In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling. The plaintiff has had a full opportunity to conduct discovery. In his papers in opposition to summary judgment, he has exhibited an understanding of the requirements of Rule 56, which were explained to him in the Local Rule 56.2 Notice. Yet, nowhere does he address his ability or inability to protect his rights during the time he has been in a mental health facility. Indeed, rather than rebut the defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he "pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis of "simple technicalities", thereby demonstrating that he was unable to protect his rights. (Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he asserted were dismissed on various grounds that, therefore, he was unable to assert the claims that he belatedly asserted in this action. He also asserts that the express reference to the statute of limitations in two of his filings "was only a mere statement I read in a book...." (Pro Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to this motion.

To the state employees who are named as individual defendants in plaintiff's Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis in the record for tolling. These individuals would be required to defend against allegations concerning events that occurred long ago brought by a plaintiff who has amply demonstrated his ability to file a lawsuit in a timely manner in other instances where he has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

felt aggrieved.

I conclude that the plaintiff has failed to raise a triable issue of fact on his claim that he was "unable to protect [his] legal rights" for the period commencing from November 18, 1998, the date of his first Court of Claims Complaint. On the issue of tolling, the plaintiff bore the burden of proof and, in response to defendant's motion, he failed to come forward with evidence sufficient to require a trial on this issue. *Holy See (State of Vatican City),* 17 A.D.3d at 794; *Assad,* 238 A.D.2d at 457. However, there remains the question of which incidents occurred more than three years prior to the commencement of this action, *i.e.* prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his May 18, 1997 assignment to Mid-Hudson, defendant Gonzales predicted that violence would be "coming [his] way." (Vallen Dep. at 216) This is Incident No. 1 in the Appendix. According to the AC, during his first months at Mid-Hudson, defendant SHTA Carrol predicted that the plaintiff would have some accidents, defendant SHTA Malfatone was aware that patient John Doe No. 1 had violent tendencies, and defendant SHTA Gonzales failed to intervene during an assault that John Doe No. 1 made against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216, 219-20) Additionally, on November 8, 1998, a patient identified in the AC as "Reshawn" physically attacked the plaintiff in front of defendant Gantz, who allegedly failed to intervene. (Complaint at 17) This is Incident No. 9 in the Appendix. One to two weeks later, defendant SHTA Gantz allegedly threatened and punched the plaintiff. (Vallen Dep. Tr. at 56-59) This is Incident No. 10 in the Appendix. Sometime between the Reshawn incident and the Gantz incident, Malfatone instructed the plaintiff to stop drinking from a water fountain, and knocked him to the ground. (Vallen Dep. Tr. at 230) This is Incident No. 13 in the Appendix.

**\*6** The plaintiff does not dispute that these incidents all occurred between May 18, 1997 and late November 1998. The three-year statute of limitations for these incidents accrued, and plaintiff's claims were thus time-barred, prior to the commencement of this action on December 10, 2001.[FN4] The defendants' summary judgment motion is granted as to Incident Nos. 1, 9, 10 and 13 set forth in the Appendix, and this portion of the plaintiff's action is

dismissed. Though claims based upon these occurrences are barred by the statute of limitations, I will consider the underlying facts to the extent they are relevant to plaintiff's opposition to the other prongs of defendants' motion. *See Jute v. Hamilton Sanstrand Corp.,* Docket No. 04-3927 (2d Cir. August 23, 2005) (considering such facts in the context of Title VII).

> FN4. Assuming that the earliest of his claims accrued in May 1997 and was tolled under CPLR 208 from May 1997 to November 18, 1998, plaintiff had three years from November 18, 1998, *i.e.* until November 18, 2001 to assert the claims. He did not assert the claims prior to that date.

2. *Lack of Showing of a Defendant's Personal Involvement*

The defendants, each of whom is individually accused of having deprived plaintiff of constitutionally-protected rights, argue that certain of the plaintiff's claims should be dismissed because there is no evidence of personal involvement in the events giving rise to the asserted claims. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

There are five ways in which a plaintiff may show the personal involvement of a defendant in a constitutional deprivation: (1) the defendant directly participated in the alleged constitutional violation, (2) the defendant, having been informed of a violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which constitutional violations occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant displayed deliberate indifference to the inmates' rights by failing to act on information that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability may not be anchored in a theory of *respondeat superior.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

*Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim." *Colon*, 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants. The plaintiff alleges that a Mid-Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising. (AC at 11-12) This is Incident No. 4 in the Appendix. SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and 3.[FN5] (Vallen Dep. Tr. at 106-07) As such, his claims arising from this incident (No. 4) are dismissed.

> FN5. According to Donna DeLusso, director of Human Resources at Mid-Hudson, SHTA Nelson has not been employed by Mid-Hudson since his retirement on October 30, 1999. (DeLusso Aff. ¶ 4)

*7 The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers. (AC at 14) This is Incident No. 5 in the Appendix. Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene. (AC at 14) However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3. (Vallen Dep. Tr. at 120-21) Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid-Hudson employees permitted C.J. to assault him in a facility dining room. (AC at 10-11) This is Incident No. 6 in the Appendix. Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault. (AC at 11) However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise

to the level of a constitutional violation. *Cf. Moncrieffe v. Witbeck*, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim). Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid-Hudson patient, A.A., had a long history of attacking people, and that Mid-Hudson staff intentionally placed A.A. in the plaintiff's proximity. (AC at 15-16) This is Incident No. 7 in the Appendix. Plaintiff alleges that SHTA Nelson positioned A.A. close to the plaintiff, and that A.A. attacked him. (AC at 15-16) However, Nelson was not served in this action, and the plaintiff has identified no other Mid-Hudson employees who were involved in the incident. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom. (AC at 23) This is Incident No. 11 in the Appendix. However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC. Plaintiff alleged that another patient, N., kicked and punched him, and that staff members laughed because N. was an older man. (AC at 24-25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid-Hudson staff who were involved in these incidents. As a result, all claims arising

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

from these three incidents (Nos.14-16) are dismissed as to all defendants.

3. *Defendants' summary judgment Motion as to plaintiff's remaining claims*

**\*8** Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although *Youngberg* established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in *Youngberg* had been involuntarily committed to a state institution-albeit one for mentally retarded individuals-and had experienced violent attacks from other residents while staying there. *See Youngberg,* 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. *Id.* The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. *Id.* at 323. This standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively

valid." *Id.* In defining its use of the term "professional", the Court appeared to include nonprofessionals acting under the direction of professional supervisors. *Id.* at 323 n. 30. Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] ... most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998). However, for pretrial detainees protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has applied the lower standard of "deliberate indifference" to Section 1983 claims arising from state officials' inattention to their medical needs.[FN6] In *Lewis,* the Court reasoned:

> FN6. In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). Officials must take " 'reasonable measures to guarantee the safety of the inmates," ' including protection of inmates from other inmates' acts of violence. *Id.* at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities." *Id.* at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

the plaintiff must also prove that a plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)).

**\*9** "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial." *Id.* at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment. *See DeShaney,* 489 U.S. at 199 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (citations omitted). However, the Fourteenth Amendment still protects these individuals, including the plaintiff in this case. *See, e.g., Lombardo v. Stone,* 2001 WL 940559, \*7 n. 7 (S.D.N.Y. Aug. 20, 2001) (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment). Moreover, the state's central role in supervising and caring for the involuntarily committed-like the pretrial detainees considered in *Lewis*-suggests that the conscience-shocking standard demands too much of such plaintiffs' substantive due process claims.

I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights. *See Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004). However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the "deliberate indifference" standard, the result is the same:

no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience, was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos.2, 3, 8, 12) set forth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim. I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times. (Vallen Dep. Tr. at 89-96; AC at 9-10) This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix. The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C.J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it. The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards-conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants' motion for summary judgment as to this incident (No. 2) is therefore granted.

**\*10** Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

Leper told Mid-Hudson patient C.J. to enter a bathroom that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20-21) In opposition, the plaintiff asserts that C.J. posed a risk of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. *See, e.g., Rodriguez v. Ames,* 287 F.Supp.2d 213, 219-20 (W.D.N.Y.2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); *Robinson v. Middaugh,* 1997 WL 567961, at *4 (N.D.N.Y. Sept. 11, 1997) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf. Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid-Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown attempted to restrain patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or practices, the defendants' motion for summary

judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid-Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a reasonable fact-finder could find in plaintiff's favor. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9-10; Vallen Dep. Tr. at 97-98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff's claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

### 4. *Qualified Immunity and Law of the Case*

**\*11** Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

### *CONCLUSION*

The defendants' summary judgment motion is GRANTED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

*APPENDIX TO MEMORANDUM AND ORDER IN VALLEN V. CARROL, 02 CIV. 5666(PKC)*

1. *Allegations Based on Events that Occurred During Plaintiff's First Few Months at Mid-Hudson Forensic*

SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5) SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales heard patient John Doe # 1 threaten plaintiff, and stood by as patient John Doe # 1 hit plaintiff in the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff" were aware that this same patient, John Doe # 1, was violent, but laughed and did nothing when patient John Doe # 1 followed plaintiff to his room and punched him. (AC at 8) The next morning, patient John Doe # 1 came up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trouble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8) These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's arrival at Mid-Hudson Forensic-within a few months of April 8, 1997. (Vallen Dep. Tr. 216, 219-20)

2. *The First Patient C.J. Allegation*

SHTA Jones and SHTAs John Doe # 1 and # 2 "let" patient C.J. "circle around" plaintiff until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe # 1 and # 2 are. (Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr. at 89-91, 95-96; AC at 9-10)

3. *The Patient S.W. Allegation*

Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were there (the "S.W. Incident"). (AC at 9-10)

4. *The Second Patient C.J. Allegation*

Patient C.J. was on assault precautions in the high observation area in the dayroom. SHTA Nelson and SHTAs John Doe # 2 and # 3 were watching the ward. Patient C.J. walked to where plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11-13) Plaintiff cannot identify SHTAs John Doe # 2 and # 3. (Vallen Dep. Tr. 106-07)

5. *The Third Patient C.J. Allegation*

Patient C.J. took a pen and left the precaution area while SHTAs John Doe # 1, # 2 and # 3 were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near the eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify John Does # 1, # 2 or # 3. (Vallen Dep. Tr. 120-21)

6. *The Fourth Patient C.J. Allegation*

**\*12** SHTAs John Doe # 1 and # 2 allowed patient C.J., who was on assault precautions, to leave his line in the dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10-11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe # 1 or # 2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

7. *The Patient A.A. Allegation*

Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15-16)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

8. *The Allegation Against SHTA Leper*

Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16-17)

9. *The "Reshawn" Allegation*

After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17) Reshawn then punched plaintiff in the mouth. (AC at 17-21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37-38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. at 222-23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff., Exh. C, at 1)

10. *The Gantz Bathroom Allegation*

SHTA Gantz threatened plaintiff and punched him in the chest in a bathroom (AC at 21-22; Vallen Dep. Tr. at 56-59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56-57; Peeples Aff., Exh. C, at 1)

11. *The SHTA March Bathroom Allegation*

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

12. *The SHTA Brown Allegation*

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

13. *The SHTA Malfatone Water Allegation*

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231-32)

14. *The Patient N. Allegation*

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24-25) Plaintiff cannot identify the staff members. (AC at 24-25; Vallen Dep. Tr. at 233-35)

15. *The $35.00 Allegation*

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235-39)

16. *The Patient B. Bathroom Allegation*

**\*13** Patient B. punched plaintiff in the bathroom, and plaintiff chased patient B. out of the bathroom. (AC at 25) Unidentified staff saw plaintiff chasing patient B, but did not see patient B. assault plaintiff in the bathroom. (AC at 25; Vallen Dep. Tr. at 238-39)

S.D.N.Y.,2005.
Vallen v. Carrol
Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

### II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.